**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JUNG JAE HYUNG, Derivatively on Behalf of BIOVENTUS, INC.<br><br>Plaintiff,<br><br>    v.<br><br>KENNETH M. REALI, MARK L. SINGLETON, GREGORY O. ANGLUM, SUSAN M. STALNECKER, WILLIAM A. HAWKINS III, JOHN A. BARTHOLDSON, PATRICK J. BEYER, PHILLIP G. COWDY, MARY KAY LADONE, MICHELLE MCMURRY-HEATH, GUIDO J. NEELS, GUY P. NOHRA, DAVID J. PARKER, MARTIN P. SUTTER, and STAVROS G. VIZIRGIANAKIS<br><br>Defendants,<br><br>  and,<br><br>BIOVENTUS INC.,<br><br>Nominal Defendant. | Case No: 1:25-cv-177<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by and through his undersigned counsel, derivatively on behalf of Bioventus, Inc. ("Bioventus" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from February 11, 2021 through March 30, 2023 (the "Relevant Period") and have caused substantial harm to the Company.

2.      Bioventus is a medical device and drug company whose financial performance is dependent on selling injections to treat osteoarthritis, known as hyaluronic acid ("HA") products. In particular, Bioventus was highly reliant on selling three HA products that accounted for over 50% of its total revenue in 2019 and 2020.  As a result, the HA products' pricing and revenue are key drivers of the Company's stock price.

3.      Critically, the Company's revenue from HA products is heavily influenced by millions of dollars in rebates that the Company is contractually required to pay back to third-party payers—private insurance companies and government programs like Medicare.

4.      The Generally Accepted Accounting Principles ("GAAP") requires Bioventus to deduct these rebates from its reported revenue to provide investors with an accurate picture of financial performance, and the Company claimed to do so.  Under GAAP's Accounting Standards Codification ("ASC") 606, Bioventus may only recognize revenue for which it is "probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period."  In other words, the Company is not permitted to recognize—and report to investors— significant amounts of revenue that it will later have to reverse (*i.e.*, remove from its financial statements) based on paying out rebates and the like.

5.      The Company claimed to follow these rules and to "report sales net of contractual allowances, rebates and returns."  Because third-party payers may demand rebates after a given

2

reporting period, the Company purported to determine the rebate amounts based on "historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns.

6.      On February 10, 2021, the Company went public through a $104 million initial public offering (the "IPO"). From the time of its IPO, the Company lacked the necessary controls to reliably deduct rebates and recognize revenue in compliance with GAAP. Rather than analyze historical rebate data and contractual requirements to calculate rebate amounts, as it was required to do, the rebate amounts that the Company deducted were simply dictated by senior management. The resulting numbers were "crazy" and inaccurate, largely because Bioventus was not capable of accurately determining the amount of rebates it owed. *See* Former Employee ("FE")[1]  1 below. This crucial control deficiency was enabled by antiquated systems that were dependent on large Excel files and manual work, in stark contrast to the modern software and automation that large public companies use to prepare accurate financial statements quickly and efficiently.

7.      The Company's significant problems with inaccurate rebate forecasting were well known to Reali, Anglum, and Singleton—the Company's CEO and CFOs during the relevant period.  At Quarterly Finance Meetings, Monthly Financial Close Meetings, and through direct objections by employees, senior leadership was apprised of the Company's inaccurate rebate forecasting, its improper revenue recognition, and that its financial systems were a "mess." *See* FE-2 below.

---

[1]      The statements attributed to the various former employees of the Company come from their statements in the Securities Class Action (defined below) complaint. The FEs corroborate the many problems facing the Company's internal controls and rebate estimates, among other things.

8.    With full knowledge of the severe deficiencies internally reported to them, the Individual Defendants (defined below) concealed the truth from investors.  To make matters worse, they falsely certified in Bioventus's Forms 10-K and 10-Q filed with the SEC that:

- "[T]he Company's internal control over financial reporting is effective";

- Bioventus's financial statements "fairly present in all material respects the financial condition, results of operations and cash flows";

- They had disclosed "All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting"; and

- Bioventus's "disclosure controls and procedures were effective at the reasonable assurance level."

9.    None of this was true, and the reality of the Company's material weaknesses left investors exposed to the risk of material misstatements and errors in the Company's SEC filings and other public statements.  In particular, the absence of effective controls and inability to accurately deduct rebates, coupled with CEO Reali's incompetent leadership, allowed the Company to overstate revenue and EBITDA by material amounts.

10.    The Company materially overstated revenue and EBITDA for at least a year, in violation of GAAP and, in November 2022, revealed a significant reversal of 15% of U.S. Pain Treatments revenue ($8.4 million) and nearly 19% of EBITDA ($4.3 million) during the third quarter of 2022.  This significant reversal was driven by admitted material weaknesses in controls: the Company admitted on November 16, 2022, that "its internal controls related to the timely recognition of quarterly rebates were inadequate," and admitted on November 21, 2022, that its "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third quarter 2022 rebates accrual was complete and accurate" and that its

"disclosure controls and procedures were not effective as of October 1, 2022." The same material weaknesses had existed since the IPO.

11. Analysts immediately questioned the large reversal, with an analyst report from Craig-Hallum noting that the "restatements" were driven by "the rebate snafu that appeared in Q3 where BVS was receiving too high of HA payments from an insurer for at least a year – this amount was incorrect." Craig-Hallum further explained that given the "restatements and uncertain financials – it suggests we could see more errors coming, just as we said there was no room for error. . . . The rebate question above does add questions to the financial infrastructure backbone at BVS and if more 'rebate adjustments' are necessary elsewhere." Indeed, in the very next quarter, another large rebate claim again materialized and reduced revenue below expectations.

12. In parallel, the Company faced an existential threat from new Medicare regulations that would severely reduce prices on its most lucrative HA products, Durolane and Gelsyn. Reali and Singleton falsely and fraudulently claimed that the pricing reduction was "net-neutral" for Bioventus, when in truth it was a disaster.

13. The new regulations—which went into effect on July 1, 2022— provided that Medicare's payments for these drugs would be based on Average Sale Price ("ASP") rather than the drugs' higher Wholesale Acquisition Cost ("WAC"). Significantly, ASP is a lower pricing metric than WAC. Because Medicare accounted for 40% of Bioventus's HA business, and its pricing also influenced the prices for large private insurers, analysts were intensely focused on whether the shift from higher WAC to lower ASP pricing would reduce Bioventus's revenues and profits.

14. In a series of earnings calls during 2022, CEO Reali assured analysts and investors that the shift was "net-neutral," and that Bioventus had analyzed the issue "very carefully" and

offset any reduced pricing by lowering "all of our rebates on our contracted business."  CEO Reali made these misstatements both before and after the shift occurred:

- On March 10, 2022, CEO Reali claimed that "[w]e've looked at this very carefully . . . it's a net-neutral for Bioventus.  While we may lose a little on the ASP reimbursement, we gain by paying less rebates because of that reimbursement change."

- On May 10, 2022, Reali again claimed that "[w]e've run these calculations very carefully, and we feel strongly that not only will we be basically neutral through this process, but we can gain market share as we go forward in the medium term." According to Reali, Bioventus performed an "analysis of volume in our business, volume of syringes, the actual reduction in rebates offsets any reduction in reimbursement, specifically based on ASP reporting."

- On August 11, 2022, after the shift to ASP went into effect, Reali declared: "We've been able to adjust all of our rebates on our contracted business . . . to a lower amount that net effect [] negates any impact on the ASPs because we're paying less rebates on our contracted business. So as we've modeled that over the past several months that turned out exactly the way we thought it would." Reali further claimed that Bioventus saw "no indication of impact on [] volume" and reiterated that "all of our ASP impact has been negated by our ability to renegotiate our rebates on a contracted business."

15.     These statements were materially false and misleading.  In truth, the shift from WAC to ASP reporting had decimated the Company's HA business and was far from "net-neutral." Indeed, without basic controls, the Company lacked the ability to perform any meaningful analysis of pricing or volume changes.  As Reali later admitted (on January 1, 2023), "when we ship out our HA syringes, we have no insight into where they're going. We don't know that they're going to a United patient or Cigna or Blue Cross, Blue Shield or Aetna, we don't get that information until quarters later, 2 quarters or even later sometimes depending on the lag of the rebate."  Without this information, Reali's statements to investors had no factual basis.  Moreover, the Company later admitted that it had not adjusted "all of [its] rebates" on "contracted business" to "negate[]" "all of" the impact of lower ASP; instead, lower rebates were increasing rebate amounts, directly contrary to Reali's prior statements.

16.     The truth about the Company's material controls weaknesses, GAAP violations, and the WAC-to-ASP shift was revealed in a series of partially corrective disclosures.

17.     First, on November 8, 2022, the Company reported financial results for the third quarter of 2022.  Just three months after claiming that "all of our ASP impact has been negated," the Company reported dismal earnings and slashed guidance because of the shift to ASP pricing, as well as what Reali claimed were "higher than normal rebate claims due to unexpected prior period rebate charges from a private payer who found errors in their earlier claims reporting."  The stock immediately plunged 57.5% in a single day.

18.     Second, on November 16, 2022, the Company announced that it would be unable to timely file its 3Q22 Form 10-Q, admitted that its "internal controls related to the timely recognition of quarterly rebates were inadequate," and disclosed that, as a result of the stock drop caused by the pricing decline and rebate errors disclosed on November 8, 2022, the Company expected to take an impairment charge in the range of $185 million to $205 million. The stock plummeted another 33%.

19.     Finally, on November 21, 2022, the Company disclosed the $8.4 million revenue reversal detailed above; incurred an $189 million impairment; revealed that the large rebate had a "cascading effect on future revenue projections [that] materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" Form 10-Q; and admitted material weaknesses in internal controls over financial reporting and disclosure controls and procedures.  The stock dropped another 3.7%.

20.     On March 31, 2023, the Company reported full-year 2022 financial results, with a 3.5% decline in sales "primarily driven by a decline in price resulting from higher than expected rebate claims," with purportedly "[u]nanticipated rebate claims from one private payer," "lower

than previously expected" ASP "for both Durolane and Gelsyn," and for Durolane, "double-digit price loss" and revenue that "declined high single digits for the quarter." The accompanying Form 10-K revealed that Reali's prior claims that the Company had "negated" "all of" the lower ASP by adjusting "all of [its] rebates" on "contracted business" were false: instead, the Company added a new statement that "due to the manner in which rebates are calculated and paid under certain of our contracts with private payers, changes in the ASP for our HA visco supplements may result in larger than expected rebates payments for the sale of these products."

21.    That large rebates and price declines hit the HA business in two consecutive quarters (the third and fourth quarters of 2022) was no coincidence. Rather, it was the direct result of Bioventus's longstanding control deficiencies and basic inability to accurately account for rebates and the actual net prices of its HA products. On April 5, 2023, the Company reported that Reali—who had presided over the Company's catastrophic decline from its IPO at $13.00 per share in February 2021 to just $1.81 per share on November 22, 2022—was terminated as CEO.

## JURISDICTION

22.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Sections 10(b) of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

23.    The Company's Articles of Incorporation state:

**ARTICLE XIII**

Unless the Corporation consents in writing to the selection of an alternative forum,
(a) the Court of Chancery (the "Chancery Court") of the State of Delaware (or, in

8

the event that the Chancery Court does not have jurisdiction, the federal district court for the District of Delaware or other state courts of the State of Delaware) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action, suit or proceeding brought on behalf of the Corporation, (ii) any action, suit or proceeding asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, other employee or stockholder of the Corporation to the Corporation or to the Corporation's stockholders, (iii) any action, suit or proceeding arising pursuant to any provision of the DGCL or the bylaws of the Corporation or this Restated Certificate (as either may be amended from time to time) or as to which the DGCL confers jurisdiction on the Chancery Court or (iv) any action, suit or proceeding asserting a claim against the Corporation governed by the internal affairs doctrine; and (b) the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. If any action the subject matter of which is within the scope of clause (a) of the immediately preceding sentence is filed in a court other than the courts in the State of Delaware (a "Foreign Action") in the name of any stockholder, such stockholder shall be deemed to have consented to (x) the personal jurisdiction of the state and federal courts in the State of Delaware in connection with any action brought in any such court to enforce the provisions of clause (a) of the immediately preceding sentence and (y) having service of process made upon such stockholder in any such action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder.

***Any person or entity purchasing or otherwise acquiring any interest in any security of the Corporation shall be deemed to have notice of and consented to this Article XIII. Notwithstanding the foregoing, <u>the provisions of this Article XIII shall not apply to suits brought to enforce any liability or duty created by the Securities Exchange Act of 1934, as amended, or any other claim for which the federal courts of the United States have exclusive jurisdiction</u>***.

If any provision or provisions of this Article XIII shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever, (a) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article XIII (including, without limitation, each portion of any paragraph of this Article XIII containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (b) the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

24.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the

exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District (*i.e.*, Defendants Kenneth M. Reali, William A. Hawkins III, Martin P. Sutter, Mark L. Singleton, and Gregory O. Anglum are citizens of the State of North Carolina); (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through being listed on the Nasdaq in this District and issuing false statements in this District.

26.    In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

**Plaintiff**

27.    Plaintiff is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

10

28. ***Nominal Defendant Bioventus*** is incorporated under the laws of the State of Delaware and its principal executive offices are located at 4721 Emperor Boulevard, Suite 100, Durham, North Carolina 27703. Bioventus's common stock trades on the NASDAQ under the ticker symbol "BVS."

**Director Defendants**

29. ***Defendant Kenneth M. Reali*** ("Reali") served as Bioventus's Chief Executive Officer ("CEO") and as a member of its Board from April 2020 and September 2020, respectively, until his termination and resignation effective April 4, 2023. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Reali received $4,395,235 in total compensation from the Company. This included $737,397 in salary, $1,454,406 in stock awards, $2,181,133 in option awards, and $22,297 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Reali received $12,618,883 in total compensation from the Company. This included $690,452 in salary, $10,844,129 in option awards, $1,057,517 in non-equity incentive plan compensation, and $26,785 in all other compensation.

30. Upon information and belief, Defendant Reali is a citizen of North Carolina.

31. ***Defendant Susan M. Stalnecker*** ("Stalnecker") has served as a member of the Board since September 2020 and serves as Chair of the Audit and Risk Committee and as a member of the Compliance, Ethics and Culture Committee. For the 2022 Fiscal Year, Defendant Stalnecker received $231,996 in total compensation from the Company. This included $80,000 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Stalnecker received $552,487 in total compensation from the Company. This included $78,861 in fees earned or paid in cash and $473,626 in stock awards.

32.    *Defendant William A. Hawkins III* ("Hawkins") has served as Chairperson of the Board since September 2020 and serves as a member of the Nominating and Corporate Governance Committee.  For the 2022 Fiscal Year, Defendant Hawkins received $316,991 in total compensation from the Company. This included $115,000 in fees earned or paid in cash and $201,991 in stock awards. For the 2021 Fiscal Year, Defendant Hawkins received $905,580 in total compensation from the Company. This included $112,153 in fees earned or paid in cash and $793,427 in stock awards.

33.    Upon information and belief, Defendant Hawkins is a citizen of North Carolina.

34.    *Defendant John A. Bartholdson* ("Bartholdson") has served as a member of the Board since January 8, 2023.  Defendant Bartholdson serves as a member of the Compliance, Ethics, and Culture Committee and as Chair of the Compensation Committee.

35.    *Defendant Patrick J. Beyer* ("Beyer") has served as a member of the Board since October 2021 and serves as a member of the Audit and Risk Committee. For the 2022 Fiscal Year, Defendant Beyer received $216,996 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Beyer received $55,019 in total compensation from the Company. This included $11,304 in fees earned or paid in cash and $43,715 in stock awards.

36.    *Defendant Phillip G. Cowdy* ("Cowdy") has served as a member of the Board since September 2020 and serves as a member of the Nominating and Corporate Governance Committee.

37.    *Defendant Mary Kay Ladone* ("Ladone") has served as a member of the Board since July 2021 and serves as a member of the Audit and Risk Committee and the Compensation Committee. For the 2022 Fiscal Year, Defendant Ladone received $224,496 in total compensation

12

from the Company. This included $72,500 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Ladone received $121,488 in total compensation from the Company. This included $33,632 in fees earned or paid in cash and $87,856 in stock awards.

38.    **Defendant Michelle McMurry-Heath** ("McMurry-Heath") has served as a member of the Board since January 2022 and serves as Chair of the Compliance, Ethics and Culture Committee. For the 2022 Fiscal Year, Defendant Heath received $228,361 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $163,361 in stock awards.

39.    **Defendant Guido J. Neels** ("Neels") has served as a member of the Board since September 2020 and serves as a member of the Compensation Committee.  For the 2022 Fiscal Year, Defendant Neels received $214,496 in total compensation from the Company. This included $62,500 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Neels received $213,503 in total compensation from the Company. This included $55,382 in fees earned or paid in cash and $158,121 in stock awards.

40.    **Defendant Guy P. Nohra** ("Nohra") has served as a member of the Board since September 2020 and serves as a member of the Nominating and Corporate Governance Committee.  For the 2022 Fiscal Year, Defendant Nohra received $226,996 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Nohra received $224,579 in total compensation from the Company. This included $66,458 in fees earned or paid in cash and $158,121 in stock awards.

41.    **Defendant David J. Parker** ("Parker") served as a member of the Board from September 2020 until December 2021. For the 2021 Fiscal Year, Defendant Parker received

$214,006 in total compensation from the Company. This included $55,885 in fees earned or paid in cash and $158,121 in stock awards.

42.     **Defendant Martin P. Sutter** ("Sutter") has served as a member of the Board since September 2020 and serves as a member of the Nominating and Corporate Governance Committee. For the 2022 Fiscal Year, Defendant Sutter received $216,996 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Sutter received $215,718 in total compensation from the Company. This included $57,597 in fees earned or paid in cash and $158,121 in stock awards.

43.     Upon information and belief, Defendant Sutter is a citizen of North Carolina.

44.     **Defendant Stavros G. Vizirgianakis** ("Vizirgianakis") served as a member of the Board from October 2021 until August 2022. For the 2022 Fiscal Year, Defendant Vizirgianakis received $188,762 in total compensation from the Company. This included $36,766 in fees earned or paid in cash and $151,996 in stock awards. For the 2021 Fiscal Year, Defendant Vizirgianakis received $52,832 in total compensation from the Company. This included $9,117 in fees earned or paid in cash and $43,715 in stock awards.

45.     Defendants Reali, Stalnecker, Hawkins, Bartholdson, Beyer, Cowdy, Ladone, McMurry-Heath, Neels, Nohra, Parker, Sutter, and Vizirgianakis are sometimes referred to herein collectively as the "Director Defendants."

**Officer Defendants**

46.     **Defendant Mark L. Singleton** ("Singleton") has served as Bioventus's Senior Vice President and Chief Financial Officer ("CFO") since March 2022. For the 2022 Fiscal Year, Defendant Singleton received $2,462,452 in total compensation from the Company. This included

14

$336,932 in salary, $990,105 in stock awards, $1,124,928 in option awards, and $10,487 in all other compensation.

47. Upon information and belief, Defendant Singleton is a citizen of North Carolina.

48. ***Defendant Gregory O. Anglum*** ("Anglum") served as Bioventus's Senior Vice President and CFO from August 2017 until March 2022. For the 2021 Fiscal Year, Defendant Anglum received $3,718,800 in total compensation from the Company. This included $425,493 in salary, $100 in bonuses, $1,532,621 in stock awards, $1,472,070 in option awards, $262,025 in non-equity incentive plan compensation, and $26,491 in all other compensation.

49. Upon information and belief, Defendant Anglum is a citizen of North Carolina.

50. Defendants Singleton, Anglum and Reali are collectively referred to herein as the "Officer Defendants."

51. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

### Non-Party Confidential Witnesses (Former Employees) Found in the Securities Class Action

52. FE 1 worked at Bioventus between November 2018 and January 2023 as a National Account Director of Market Access. In this role, FE 1 was responsible for negotiating contracts between Bioventus and insurance companies.  According to FE-1:

(a) CEO Ken Reali was "incompetent" and his revenue forecast for 2022 was "crazy": CEO Reali was "incompetent" and made a lot of bad mistakes. Reali was adamantly focused on acquisitions and there was significant pressure on employees to keep Bioventus's stock price high in order to finance acquisitions and pay for them. In early 2022, FE-1 was surprised when CEO Reali announced the Company was raising its revenue forecast for the year. The revenue forecast was "crazy," FE-1 said, and CEO Reali should never have said that. At that time, sales of the HA products, which made up 60 percent of the Company's revenue, were not growing; Exogen had been performing poorly for years; and none of the newly acquired products performed well. In sum, the Company was not growing. The

Company's claim in November 2022 that it was hit by an unexpected, large rebate request was incorrect, and used as a scapegoat for the Company's inability to meet CEO Reali's exaggerated revenue forecast.

(b)    Rebate requests were predictable based on information available to the Company: Customers had a year to submit their rebate requests, and over the course of a year, the rebate requests evened out to equal the contractual amount owed for payments made.  So if a quarterly rebate request was lower than the contractually-mandated amount owed based on sales, the customer will predictably submit higher rebate requests in the subsequent quarters such that, within any given year, the total rebate requests evened out to equal the contractual amount owed. For example, if a payer consistently had $1,000 in claims per quarter, but a particular quarter claimed rebates for just $700, the Company should be ready for an additional $300 within the next year. FE-1 was skeptical of the suggestion that Bioventus could not have anticipated the large rebate request that came in after the books closed in Q3 2022. The Company should have expected the rebate because the Company could have determined the amount of rebates Bioventus would need to pay each customer based on contractual agreements.

(c)    Bioventus had no system or process to track revenue, rebates, and discounts for each insurer: FE-1 was not aware of Bioventus ever having any system or process to track revenue, rebates, and discounts for each insurer.

(d)    Bioventus held Quarterly Finance Meetings where the sales team expressed concerns with inaccurate rebate forecasting and improper revenue recognition: At Quarterly Finance Meetings held at Bioventus's headquarters, the sales team expressed concerns with inaccurate rebate forecasting and improperly recognizing revenue. Given the poor systems and uncertainty over rebates, they urged that Bioventus should be more conservative to avoid reversing or lowering its revenue figures when the Company was later hit with rebate requests.

53.    FE 2 worked at Bioventus between October 2021 and June 2022 as a Financial Planning and Analysis Manager. Prior to that, FE 2 worked at Misonix from January 2021 until it was acquired by Bioventus in October 2021. According to FE-2:

(a)    Bioventus had poor financial monitoring, tracking, and forecasting systems: When Misonix was acquired, FE-2 was surprised by the lack of sophistication in Bioventus's financial management and forecasting systems. The ability to track things and report things accurately, and to measure and monitor things, was severely limited due to how poor the Company's system was. It was "like they were in the stone age."

16

(i)     Bioventus used an SAP system for accounting. From previous experience with SAP accounting systems at other companies, FE-2 was aware of how sophisticated and automated that accounting software can be when done right. But Bioventus's SAP system had none of that sophistication and automation. Bioventus's SAP system could not do a number of actions that are routine at other companies, such as allocations and reverse entries. By failing to implement proper accounting software, Bioventus lacked use of any of the true functionalities, which would have given the Company much more accurate data, and more quickly.

(ii)    Bioventus used another software system, Oracle PBCS, for forecasting. FE-2 also had experience with Oracle PBCS software at a previous job, and was familiar with its capabilities. But at Bioventus, the forecasting system was not set up right. The Company was barely using any functionality and "I was kind of mind blown," FE-2 explained. To make matters worse, the Company's IT department wanted nothing to do with Oracle and was not improving functionality, which was "scary" because the Company relied on the Oracle system in order to populate its financial statements.

(b)     Bioventus lacked any system to track headcount and payroll expenses, and instead calculated Company expenses by forcing employees to spend a few weeks each year to try to gather this information: FE-2 worked on a special project to get a better handle on the Company's headcount and payroll costs, but the Company put that project on pause. Salary and payroll was a major expense at Bioventus, yet the Company lacked a system that could quickly and accurately report how many employees worked at the Company and how much the Company was spending on payroll. Instead, Bioventus was trying to manage this data on an Excel spreadsheet, and Bioventus employees were forced to spend a few weeks every year trying to gather the right information and data to identify the company's headcount and calculate its payroll costs. This practice was "insane" because, at a good company, these functions can be performed in an hour, or a few minutes each.

(c)     Bioventus's rebate tracking and forecasting system was "a real mess": The financial team charged with tracking and forecasting rebates reported to FE-2 and others that the Company had no controls on which customers were asking for rebates or how much they were asking for. Instead, there were thousands of lines, and they were trying to do it in an Excel file, without any kind of system in place. It was "a real mess."

(d)     FE-2 told CFO Singleton and Other Executives that the Company's financial systems were in dire need of improvement: FE-2 was vocal

regarding FE-2's concerns about the Company's poor systems for managing its finances. "I flagged it to them immediately" and "I kept bringing it up," FE-2 said. Bioventus also did not have the systems and processes in place to take on two major acquisitions. Among other things, FE-2 reported these concerns about the poor systems directly to Diane Schabinger, Director of FP&A and Business Intelligence, and also to CFO Mark Singleton. In fact, FE-2 told Singleton that the financial systems were a "mess."

(e)    Bioventus's CFO was kept informed of these deficiencies at Monthly Financial Close Meetings: FE-2 attended Monthly Financial Close Meetings to review the Company's financial performance, budget, and forecasting on a monthly basis, including forward-looking metrics. Attendees also included CFO Anglum (later CFO Singleton), VP of Finance Ben Fishburn, Director of FP&A and Business Intelligence Diane Schabinger, and the FP&A group, among others. This monthly meeting kept the CFO informed on key issues, including the transition from WAC to ASP pricing for HA products and problems with the Company's rebate estimates. When Mark Singleton came in as CFO, he "walked into a shitshow." The Company's systems were a mess, but there was no clear discussion or resolution to improve or correct them. For each Monthly Financial Close Meeting, FE-2 worked with others to prepare a PowerPoint that was circulated to attendees and presented at the meeting.

54.    FE 3 worked at Bioventus between April 2021 and January 2022 as an Internal Audit Manager. In that role, FE 3 reported directly to Jessica Dill Gidney ("Gidney"), Bioventus's Director of Internal Audit and Risk Management, who in turn reported to the Audit and Risk Committee of the Board.

55.    FE 4 worked at Bioventus between August 2020 and January 2022 as a Senior Manager of SOX & Internal Audit. In this role, FE 4 reported directly to Gidney.

56.    FE 5 worked at Bioventus as an Accounts Payable Specialist from February 2018 until January 2020 and as a Senior Accounts Payable Specialist from January 2020 until November 2021. During his time at Bioventus, FE 5 received and processed requests for payment, including rebate claims from insurance companies.

57.    FE 6 worked at Bioventus between August 2021 and August 2022 as a Payment Specialist.

## SUBSTANTIVE ALLEGATIONS

**Background**

58.    Bioventus is a medical device Company incorporated in Delaware and based in Durham, North Carolina, specializing in injectable therapies for musculoskeletal healing and regeneration.

59.    On February 11, 2021, Bioventus went public via in initial public offering ("IPO"), issuing 9.2 million shares of Class A common stock at a price of $13.00 per share, generating proceeds of $119.6 million.

60.    Bioventus generates revenue in three different business segments, referred to as "verticals": Pain Treatments, which include HA injections used to treat knee pain caused by osteoarthritis, Surgical Solutions, and Restorative Therapies.  Pain Treatments account for the vast majority of the Company's sales.  Indeed, sales of HA injections alone accounted for 49%, 54% and 53% of the Company's total revenues in 2018, 2019, and 2020, respectively.

61.    Bioventus offers three HA injection products: (i) Supartz, a therapy introduced in 2001 consisting of five injections.; (ii) Gelsyn, a therapy introduced in 2016 consisting of three injections; and (iii) Durolane, a single-injection therapy introduced in 2018.

62.    Given Bioventus's reliance on its Pain Treatment vertical and its sales of HA injections in particular, the Company's revenue generated from these sales was a key indicator of the Company's overall growth and performance.

**Bioventus Failed to Accurately Report**
**Revenue due to Materially Deficient Internal Controls**

63.    Medical device manufacturers like Bioventus often enter into agreements with third parties such as hospitals or insurance companies, offering those third parties a financial incentive,

19

or rebate, if the third party for example, in the case of an insurance company, includes the manufacturer's products on its list of covered products.

64.     Rebates complicate the reporting of revenues for companies like Bioventus. For instance, if Bioventus were to sell an HA injection to a patient for $100.00, the patient's insurance company might subsequently request a $25.00 rebate from Bioventus.  Bioventus would therefore only earn $75.00 in revenue from the sale.

65.     GAAP requires that Bioventus deduct expected rebates in its recognition of revenues.  In the hypothetical example above then, GAAP would mandate Bioventus only report $75.00 in revenue from the sale, rather than $100.00.

66.     Further, pursuant to Accounting Standards Codification ("ASC"), GAAP requires that Bioventus only recognize the amount of revenue for which it is "probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period."[2] To the extent that there is uncertainty regarding the likelihood of a reversal, GAAP requires companies to deduct rebates from the revenues they report.  During the Relevant Period, Bioventus violated these express GAAP requirements by failing to account for rebates in its reporting of revenues and adjusted EBITDA, causing the Company's reported revenues to be materially overstated and ultimately resulting in a significant reversal.

67.     GAAP refers to rebates as "variable consideration" and pursuant to ASC 606, companies are required to "estimate the amount of variable consideration." GAAP provides two methods for calculating variable consideration: the "expected value" and the "most likely amount." ASC 606 further requires that companies "consider all the information (historical, current, and

---

[2]     A "reversal in the amount of revenue refers to a reduction of revenue already recognized in public financial statement.

forecast) that is reasonably available to [the Company] and identify a reasonable number of possible consideration amounts."

68.    During the Relevant Period, Bioventus purported to calculate variable consideration using the expected value method, which involves taking "the sum of probability-weighted amounts in a range of possible consideration amounts."  For example, if there is a 75% chance that a company's variable consideration for a given fiscal period will equal $100 and a 25% change that a company's variable consideration for that fiscal period will equal $40, then, pursuant to the expected value method, that company should deduct $85.00 from its revenues for that period.

69.    Further, Bioventus was required to "consider all the information (historical, current, and forecast) that is reasonably available" in calculating variable consideration. This included a consideration of Bioventus's customer contracts, which included a total amount of rebates allowed per year. Further, pursuant to the Company's customer contracts, insurers had a year to submit their rebate requests.  Therefore, future rebate requests were readily determinable based on the information reasonably available to the Company. For example, if an insurer consistently requested $1,500 in rebates each quarter but only requested $1,250 for one quarter, the Company should expect an additional $250 in rebates to be requested within the following year.

70.    In its public filings, Bioventus repeatedly claimed that it calculated variable consideration using "historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns."  In reality, the Company failed to implement any procedures at all to monitor revenue or rebates from the insurance companies with which Bioventus conducted business.

71.    FE 2 worked at Misonix from January 2021 until it was acquired by Bioventus in October 2021.  FE 2 then worked at Bioventus as a Financial Planning and Analysis Manger until

June 2022.  According to FE 2, Bioventus failed to use even basic accounting technology. FE 2 recalled Bioventus employees spending weeks on tasks that should have been automated and that would ordinarily take just minutes to complete at other companies, referring to the process as "insane."

72.    FE 6, a Payment Specialist at Bioventus from August 2021 until August 2022, similarly recalled that employees "didn't even know which bills had been paid or not paid" and "were blinding paying for stuff" because the Company had "no supporting documents" for bills.

73.    FE 5, who worked at Bioventus as an Accounts Payable Specialist, described the Company's process for monitoring rebates as a "real mess" and recalled struggling to navigate Excel spreadsheets with thousands of lines.  According to FE 5, the Company had "big problems with the whole rebate calculation" and "[t]hey were always off."  FE 5 further confirmed that Bioventus's senior leadership, including Defendants Reali, Anglum and Singleton, regularly discussed the Company's inability to calculate and track rebates.  FE 2 similarly stated that the rebate issue was frequently discussed at monthly Financial Close Meetings attended by Defendants Anglum and Singleton.

**Internal Audit Puts the Individual Defendants**
**on Notice of the Company's Deficient Internal Controls**

74.    FE 4 worked for Bioventus from August 2020 until January 2022 as Senior Manager of SOX and Internal Audit.  According to FE 4, after receiving a multi-million dollar rebate claim from United in May or June of 2021, the Company launched an audit of Bioventus's entire rebate process, reviewing the previous 12 months of rebates and testing the Company's controls over its rebate process, including SOX controls. FE 4 stated that the internal audit was conducted by FE 3, Bioventus's Internal Audit Manager, with the assistance of Jill Gidney, Bioventus's Director of Internal Audit and Risk Management.

22

75.     The internal audit resulted in a "Red Report." According to FE 4, the "red" designation indicated that there were serious issues with the Company's processes and controls that needed to be rectified immediately, whereas "yellow" would have indicated that there were some issues present, and "green" would have indicated that all of the Company's processes and controls were effective. The Red Report highlighted twelve urgent action items that needed to be promptly addressed by the Company and found that Bioventus's SOX controls and controls regarding rebates, rebate payments, and rebate accruals were ineffective.

76.     According to FE 3, Bioventus established rebate "accrual" rates for each insurance company with which it conducted business. These rates represented estimates of the rebate amount for a given insurance company as a percentage of the revenue generated from that insurance company. For instance, a 10% accrual rate for a given insurer indicated that the Company estimated that it would owe that insurer $10.00 in rebates for every $100.00 made in sales. The Red Report found that the Company had never even created, let alone implemented, any process for accurately calculating rebate accruals.

77.     FE 3 stated that the Company would change the accrual rates quarterly without justification. During the internal audit that resulted in the Red Report, FE 3 recalled asking the rebate department "why are you using five percent versus 10 percent?" FE 3 was given no reasoning and was just told that "they didn't know." FE 3 recalled specifically telling the rebate team that "you can't arbitrarily pick a number" as an accrual for a given insurer.

78.     FE 4 similarly recalled the Company "blindly" paying the rebate claims received from insurance companies without having any means of independently confirming the amount owed.

23

79.     FE 3 confirmed that the Company's senior leadership was made aware of the Red Report.  In fact, FE 3 recalled participating in a meeting with Defendant Anglum and other senior leadership in which the results of the internal audit were discussed before the Red Report was even issued.  FE 3 stated that, with respect to senior leadership: "[t]hey knew [the Company's method of calculating rebate accruals] was broken." Subsequently, in August 2021, FE 3 sent the Red Report directly to Defendants Reali, Anglum, Stalnecker and FE 4.  FE 3 and FE 4 both confirmed that the Red Report was then given to the Audit and Risk Committee, of which Defendants Beyer Stalnecker, and Ladone were members, and discussed by the Audit and Risk Committee during a quarterly Board meeting.

80.     Despite knowledge of the Red Report and its findings, the Individual Defendants did nothing to address the Company's deficient internal controls.  FE 4 characterized the Company at the time as a "shitshow," stating that the Individual Defendants were prioritizing acquiring other companies rather than hiring the needed personnel to implement the changes mandated by the Red Report.

**Excessive Acquisitions put Financial Strain on the Company**

81.     Instead of using the Company's limited resources to address the severe deficiencies in Bioventus's internal controls, the Individual Defendants entered into a series of major acquisitions.

82.     Shortly after receiving funds from the IPO, the Individual Defendants caused the Company to enter into three massive and imprudent acquisitions, putting Bioventus in debt in excess of $360 million.  In March 2021, the Company acquired Bioness, a healthcare company focused on rehabilitation therapies, for $48.8 million in cash.  The Bioness agreement required the Company to pay Bioness an additional $50 million in cash by 2025 if certain conditions were met.

In October 2021, Bioventus acquired Misonix, Inc., a healthcare company focused on ultrasonic technology and regenerative medicine, for $525.3 million, of which $182,988,467 was in cash. Then, in July 2022, Bioventus moved to acquire CartiHeal, a healthcare company focused on designing knee implants, by depositing $50 million in escrow and "finance[ing] the remaining portion of the potential acquisition of CartiHeal with additional debt." Pursuant to the CartiHeal arrangement, Bioventus would "acquire all of the shares of CartiHeal, excluding those it already owned, for $314.9 million, payable at closing in the second quarter of 2022. Upon the achievement of certain sales milestones, an additional $135.0 million could become payable after closing."

83. These excessive acquisitions, at a time when the Company was struggling internally, put immense financial strain on the Company. Further, the need to finance these acquisitions incentivized the Individual Defendants to issue false and misleading statements regarding Bioventus in order to maintain the artificially inflated price of the Company's stock.

**New Federal Medicare Regulations Reduce the Company's**
**Margins and Profitability for two of its Best-Selling Products**

84. By January 2022, Bioventus had still failed to implement the changes mandated by the Red Report. Meanwhile, the Company was in significant debt as a result of the acquisitions that it made throughout 2021. Due to the Company's high debt position, the Individual Defendants were incentivized to misleadingly assure the investing public that the Company would be able to cover its obligations for past and future acquisitions with the revenue it would generate from sales of its HA injections.

85. To this end, on March 10, 2022, the Company released financial guidance that forecasted significant growth from sales of HA injections. Specifically, the Company forecasted 2022 revenues of $545 million to $565 million, representing growth of 26% to 31% year-over-year. During an earnings call the same day, Defendant Reali highlighted Bioventus's "HA

business where we continue to gain market share with Durolane, our single injection, and Gelsyn, [] our 3 injection, and we see that continuing. The HA market is very strong."

86.     In reality, the Company's revenues were stagnating due in part to newly enacted federal regulations regarding Medicare drug pricing, which reduced prices for two of the Company's main HA products: Durolane and Gelsyn.

87.     The Company's contracts for HA products used one of two types of pricing for reporting purposes: Wholesale Acquisition Cost ("WAC"), which does reflect rebates and discounts, and Average Sales Price ("ASP"), which does not reflect rebates and discounts. Historically, Bioventus had been exploiting a regulatory loophole that allowed it to report only WAC prices on Durolane and Gelsyn to the federal government's Center for Medicare and Medicaid Services ("CMS"). This caused Medicare and Medicaid to pay higher reimbursement prices for these products.

88.     Congress addressed the loophole in its Consolidated Appropriations Act, 2021, with a new law that required drug manufacturers like Bioventus to report ASP pricing information to the CMS each quarter, beginning in January 2022. This would cause Medicaid to pay less for Durolane and Gelsyn in 2022 than it had in the past.

89.     The disparity between the Company's WAC and ASP pricing for Durolane and Gelsyn was vast. For example, in the first quarter after the products were added to the CMS price list, Gelsyn's ASP dropped 8% and Durolane's ASP dropped 11%. The following quarter, Gelsyn's ASP declined another 22% and Durolane's ASP declined another 20%. This was an anomaly: out of the 64 products added to CMS's Medicare Part B price list since January 1, 2021, the median change in reported ASP in the two quarters after a drug is added to the list is -0.1% and

0.0%, respectively.  In short, Bioventus was far more reliant on the regulatory loophole than its competitors, and the Company was ill-prepared for the ASP reporting shift.

90.     As observed by analysts from J.P. Morgan in a March 8, 2021 report, Medicare accounted for 40% of the Company's HA injection revenues, whereas the commercial sector accounted for the other 60%.  During the first quarter of 2021, Bioventus reported $41.53 million in revenue from its Pain Treatments vertical, which included the Company's HA injection products. Of that $41.53 million, Medicare accounted for $16.6 million in revenues. Assuming Durolane and Gelsyn comprised at least two thirds of the $16.6 million in Medicare revenue, then Medicare revenues from sales of those two products were roughly $11 million for the first quarter of 2021.  As the shift to ASP pricing caused a roughly 20% decrease in the prices of Durolane and Gelsyn, the shift would result in a quarterly reduction of Medicare revenue in the millions.

91.     Exacerbating the issue was the fact that non-Medicare/Medicaid patient pricing, set by private healthcare entities, often adjusted their pricing to correspond with changes in Medicare/Medicaid pricing.  As a result, the Company would receive reduced revenue from both Medicare and its commercial clients.

92.     Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Bioventus had materially deficient internal controls over financial reporting; (i) The Red Report specifically found that the Company's internal controls were ineffective and that the Company lacked any formal method of calculated rebate accruals or tracking rebates; (iii) as a result, the Company's revenues were overstated and Bioventus faced a substantial risk of a material revenue reversal; (iv) the shift to ASP pricing was going to drastically reduce the margins and profitability of the Company's two

main products; and (v) as a result of the foregoing, the Individual Defendant's positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

93.     On January 12, 2021, Bioventus filed a registration statement with the SEC on Form S-1. After several amendments, the registration statement was declared effective by the SEC on February 10, 2021 (the "Registration Statement").  On February 12, 2021, Bioventus filed a prospectus on Form 424B4 with the SEC, which was incorporated into the Registration Statement (the "Prospectus"). The Registration Statement was signed by Defendants Reali, Anglum, Hawkins, Cowdy, Neels, Nohra, Stalnecker, Parker and Sutter.

94.     The Registration Statement falsely stated that, pursuant to the Company's revenue recognition policy, Bioventus only reported revenues that were "net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, [and] contractual allowance."

95.     The Registration Statement continued, stating that "these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns."  Specifically regarding rebates, the Registration Statement claimed that the Company "reduce[s] revenue and record[s] the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases."

96.    The Registration Statement indicated that the Company's revenue recognition procedures were in compliance with ASC 606, stating that "[t]he amount of variable consideration is included in the transaction price" and thus is only recorded as revenue "to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period."   In the Registration Statement, the Company further purported to "regularly review all reserves and update them at the end of each reporting period as needed."

97.    The Prospectus reiterated the Company's compliance with ASC 606, stating that Bioventus "report[s] sales net of contractual allowances, rebates, and returns." The Prospectus continued:

*Revenue recognition*

Sales of products

….

We recognize revenue at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude from revenues taxes collected from customers and remitted to governmental authorities.

***Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements and certain distribution and administration fees offered in our customer contracts and other indirect customer contracts relating to the sale of our products.*** We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed.

29

Adjustments arising from the change in estimates of variable consideration were not significant for the years ended December 31, 2019 and 2018.[3]

98.     The Prospectus further stated:

**Discounts and rebates**

[…] We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases.

99.     On March 26, 2021, Bioventus filed its 2020 annual report on Form 10-K with the SEC (the "2020 Form 10-K"), which was signed by Defendants Reali, Anglum, Hawkins, Cowdy, Neels, Nohra, Stalnecker and Sutter.  With respect to revenue recognition, the 2020 Form 10-K stated:

*Revenue Recognition*

Sale of products

….

We recognize revenue at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude from revenues taxes collected from customers and remitted to governmental authorities. ***Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements and certain distribution and administration fees offered in our customer contracts and other indirect customer contracts relating to the sale of our products.*** We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. There were no adjustments arising from

---

[3]     All emphasis is added unless indicated otherwise.

30

the change in estimates of variable consideration for the years ended December 31, 2020 and 2019.

100. With respect to discounts and rebates, the 2020 Form 10-K stated:

**Discount and rebates**

[…] We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases.

101. The notes to the financial statements provided in the 2020 Form 10-K stated:

*Discounts and gross-to-net deductions*

[…] The Company reduces revenue and records the reserve as a reduction to accounts receivable for the estimated discount and rebate at the expected amount the customer will earn, based on historical buying trends and forecasted purchases.

102. The 2020 Form 10-K indicated that the Company's internal controls had been evaluated and found to be effective:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2020

\* \* \*

During 2020 we remediated a material weakness associated with the proper processing of Exogen reimbursement claims in accordance with regulations and contractual terms.

103. On May 13, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of 2021 (the "1Q2021 Form 10-Q"). With respect to revenue recognition, the 1Q2021 Form 10-Q stated that Bioventus's "policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K."

31

104.    The 1Q2021 Form 10-Q reiterated that the Individual Defendants had found the Company's internal controls to be effective:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of April 3, 2021

105.    On August 11, 2021, Bioventus filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2021 (the "2Q2021 Form 10-Q"). The 2Q2021 Form 10-Q repeated the statement contained in the 1Q2021 Form 10-Q that Bioventus's "policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K."

106.    The 2Q2021 Form 10-Q again represented that the Individual Defendants had found the Company's internal controls to be effective:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of July 3, 2021.

107.    On November 10, 2021, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2021 (the "3Q2021 Form 10-Q").  The 3Q2021 Form 10-Q repeated the exact same statement that was contained in the 1Q2021 Form 10-Q and the 2Q2021 Form 10-Q that Bioventus's "policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K."

108.    In the 3Q2021 Form 10-Q, the Individual Defendants maintained that the Company's internal controls were effective:

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q.  Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of October 2, 2021.

109.    On March 10, 2022, Bioventus filed a current report on Form 8-K with the SEC, announcing the Company's fourth quarter and fiscal year 2021 financial results. That filing reported $62.7 million in revenue for the Pain Treatments vertical, $130.4 million in total net sales, and $28.5 million in adjusted EBITDA for the fourth quarter of 2021.

110.    During an earnings call held the same day, in response to a question regarding Medicare "potentially cutting prices in the not-too-distant future" and how well Bioventus is prepared for the transition relative to its competitors, Defendant Reali stated:

Yes. Thanks for the question, Drew, on that. We've looked at this very carefully, and this is not a Medicare cut per se, but it's focused on ASP reporting and ASP reimbursement, average selling price reimbursement. One of the things that we've historically done at Bioventus in our HA business is focused on market access. And what that means is having specific contracts with insurance carriers such as United Healthcare, the largest private carrier in the country today. And with those contracts, gives us unfettered access to accounts and the ability to cross sell to what we call non-contracted, non-United patients. But we also spend a lot of money relative to getting those contracts through rebates back to insurance companies where we have that unfettered access in that exclusive contract. ***So when we look at this analysis for us, and this is specific to Bioventus, I can't speak for other countries or other companies, rather, it's a net-neutral for Bioventus.*** While we may lose a little on the ASP reimbursement, we gain by paying less rebates because of that reimbursement change.

So for Bioventus, it provides us with basically a balanced footing on the HA reimbursement side. We may see some choppiness as we go through this, and we're projecting this would occur in the third quarter this year. But we feel that choppiness will be very short-lived as we work through the ASP reimbursement

and, of course, the rebate change associated with that, that we pay back to insurance companies.

111.    On March 11, 2022, Bioventus filed its 2021 annual report on Form 10-K with the SEC (the "2021 Form 10-K"), which was signed by Defendants Reali, Anglum, Hawkins, Beyer, Cowdy, Ladone, Heath, Neels, Nohra, Stalnecker, Sutter and Vizirgianakis.   With respect to revenue recognition, the 2021 Form 10-K stated:

Sale of products

….

We recognize revenue generally at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude taxes collected from customers and remitted to governmental authorities from revenues. ***Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements, and certain distribution and administration fees offered in customer contracts and other indirect customer contracts relating to the sale of products.*** We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability weighted for relevant factors such as our historical experiences, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. There were no significant adjustments arising from the change in estimates of variable consideration for the years ended December 31, 2021 and 2020.

112.    The notes to the financial statements provided in the 2021 Form 10-K stated:

***Discounts and gross -to-net deductions***

[…] The Company reduces revenue and records the reserve as a reduction to accounts receivable for the estimated discount and rebate at the expected amount the customer will earn, based on historical buying trends and forecasted purchases.

34

113.    The 2021 Form 10-K again indicated that the Company's internal controls had been

evaluated and found to be effective:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2021.

***Management's Report on Internal Control over Financial Reporting***

….

In connection with the preparation and filing of this Annual Report, the Company's management, including our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021, based on the framework set forth in "Internal Control—Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Our assessment of, and conclusion on, the effectiveness of internal control over financial reporting did not include Misonix and Bioness, both acquired by the Company in 2021 and included in our 2021 consolidated financial statements. Misonix and Bioness are now wholly-owned subsidiaries of the Company and comprised approximately 51.2% and 6.4%, respectively, of total assets, and approximately 3.6% and 7.9%, respectively, of total net sales, of the Company's related consolidated financial statement amounts as of and for the year ended December 31, 2021. Based on its evaluation, the Company's management concluded that, as of December 31, 2021, the Company's internal control over financial reporting is effective.

114.    On April 29, 2022, Bioventus filed a Proxy Statement with the SEC (the "2022 Proxy") to solicit shareholder approval for, *inter alia*, the election of Defendants Heath, Neels, Nohra and Vizirgianakis.

115.    With respect to the Board's risk oversight function, the 2022 Proxy stated:

One of the key functions of our Board of Directors is informed oversight of our risk management process. Our Board of Directors has delegated to the Audit and Risk Committee oversight of the Company's enterprise risk assessment and management processes, including oversight of the Company's financial and cybersecurity risks.

Management quarterly presents to the Audit and Risk Committee on cyber and information security. Our Nominating and Corporate Governance Committee monitors the effectiveness of our Corporate Governance Guidelines. Our Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking. Our Compliance, Ethics and Culture Committee is responsible for oversight of legal, compliance, and regulatory risks. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board of Directors is regularly informed through committee reports about such risks.

116.    On May 9, 2022, Bioventus filed a current report on Form 8-K with the SEC, announcing the Company's financial results for the first quarter of 2022.  That filing reported $52.1 million in revenue for the Pain Treatments vertical, $117.3 million in total net sales, a net loss of $14.8 million, and $7.1 million in adjusted EBITDA.

117.    During the related earnings call held on May 10, 2022, an analyst asked the following question:

[Y]ou touched on the potential pricing mechanism change here coming in the second half of the year. I think if you could maybe just provide a little bit more detail on sort of the mechanism of how that pricing change could affect your business. And any quantification you might be willing to sort of characterize over the next 12 months or as you annualize the potential pricing change.

118.    In response, Defendant Reali responded:

Sure.  So the way we look at this is we do expect the ASP reporting to happen. It's not 100%, but we think it's likely in the second half of the year. And that impacts Medicare pricing specifically to ASP reporting. But on the other side of the equation is our contracted business where we pay rebates. Very specifically, with contracts like United and Cigna, we pay rebates. Within our contracts with these payers, we have very specific clauses to reduce the rebates based on ASP reporting.

So when we do our analysis of volume in our business, volume of syringes, the actual reduction in rebates offsets any reduction in reimbursement, specifically based on ASP reporting. ***We've run these calculations very carefully, and we feel strongly that not only will we be basically neutral through this process, but we can gain market share as we go forward in the medium term.***

119.    On May 11, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2022 (the "1Q2022 Form 10-Q"). The 1Q2022 Form 10-Q repeated the exact same statement that was contained in the Company's previous quarterly reports that Bioventus's "policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K."

120.    1Q2022 Form 10-Q again stated that the Company's internal controls and procedures were found to be effective:

### Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of April 2, 2022.

121.    On August 10, 2022, Bioventus filed a current report on Form 8-K with the SEC, announcing the Company's financial results for the second quarter of 2022. That filing reported $63.9 million in revenue for the Pain Treatments vertical, $140.3 million in total net sales, a net loss of $8.0 million, and $22.9 million in adjusted EBITDA.

122.    During the related earnings call held on August 11, 2022, Defendant Reali stated:

As we highlighted on previous earnings calls, reimbursement for HA shifted from wholesale acquisition cost to average selling price at the end of June. ***Given the sales mix of our HA portfolio, this new pricing dynamic has not fundamentally impacted our overall growth opportunity.*** As expected, we have been able to lower our reimbursement rebate rates on all of our preferred contracts with private payers, which has offset lower pricing for other areas of our HA business.

The modifications to these agreements are consistent with our modeling exercises done over the past several months as we prepared for this new environment.

123.    Also, during the call, in response to a question regarding the impact of the ASP pricing shift on the Company, Defendant Reali stated:

Well, we did see, based on ASP reporting a dip in our pricing for DUROLANE and GELSYN, in particular, [Supartz] was already ASP reported. But as we've talked about that has been countered by our rebate adjustments that per our planning, and we're very pleased with the results of this and it's a credit to our market access team. We've been able to adjust all of our rebates on our contracted business, which is a significant portion to a lower amount that net effect, Alex, ***negates any impact*** on the ASPs because we're paying less rebates on our contracted business.

***So as we've modeled that over the past several months that turned out exactly the way we thought it would. So the first phase of this has gone well.***

124.    Later during the call, in response to a question regarding the Company's financial guidance for its HA sales, Defendant Reali stated:

So what's built into our forecast going forward is continued volume growth in our HA business as we've seen before because we've seen no indication of impact on the volume and that's certainly something we'll take advantage of. ***And as I talked about in the prior question on HA, a lot of our ASP impact, all of our ASP impact has been negated by our ability to renegotiate our rebates on a contracted business,*** which is a significant portion and that has been true to our model and it's something that we're excited about.

125.    On August 12, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2022 (the "2Q2022 Form 10-Q"). The 2Q2022 Form 10-Q repeated the statement that was contained in the Company's previous quarterly reports that Bioventus's "policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K."

126.    In the 2Q2022 Form 10-Q, the Individual Defendants maintained that the Company's disclosure controls and procedures were effective:

***Evaluation of Disclosure Controls and Procedures***

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of July 2, 2022.

127. On September 14, 2022, at the Morgan Stanley Global Healthcare Conference, an analyst asked Defendant Singleton the following question:

[E]arlier in the year, there was the big debate about what Medicare changes in pricing regime will kind of [do] to the HA market. And I think if I kind of go back and look at your updated guidance, I mean, it sounds like you're kind of baking in some potential disruptions in the marketplace. But for 2 months, roughly 2 months after the change, I mean, are you seeing anything from an underlying utilization perspective that's giving you concern that there is going to be disruption in the HA market as a result of the change?

128. In response, Defendant Singleton stated:

Yes, obviously I'm new to the HA market, but I will tell you, I really have a lot of confidence in the team that we have navigating us through that. And so far, for the first 2 months, it's progressing as we had it expected and have modeled into our numbers. And so that's kind of as expected.

129. When the analyst probed further, asking if there was "any disruption [] that was kind of baked in there," Defendant Singleton stated:

Yes. I guess I guess what adjective you want to put on it disrupted or choppiness, ***Yes, we expect a little bit of choppiness in the back half as we make the transition from WAC to ASP, but it's kind of all built into our models.***

130. Also, during the conference, in response to a question regarding the importance of entering into exclusive contracts with more commercial insurers after the ASP pricing shift, Defendant Singleton stated:

I think we're going to – we feel really good. I mean, Cigna has just come on. I mean between Cigna and United that gives us really access to preferred lives and a lot of leverage in the market. We believe that's going to help us going through the WAC to ASP transition, ***we have adjusted our contract with them from the standpoint of the rebates favorability that was associated with the WAC going to the ASP world.***

131. During an earnings call held on November 8, 2022, Defendant Reali stated:

While we expect to see continued pressure on GELSYN revenue through the first half of 2023, we believe that the mechanics of ASP reporting will resolve this issue as full ASP reporting takes effect and GELSYN pricing stabilizes to a more competitive position. As a reminder, ASP reporting is based on a 4-quarter look back. While both GELSYN and DUROLANE moved from WAC to ASP pricing,

this dynamic did not impact DUROLANE, which maintained strong double-digit growth for the quarter.

132. Later, during the earnings call, an analyst asked Defendant Reali the following question:

[A]s you're looking at these issues, and I get that some of these are transitory, what's giving you really the confidence on the visibility to maybe label some of these as transitory. And maybe specifically with the HA side, you talked about being like kind of mid next year until these kind of resolved. But again, kind of what gives you confidence –that level of confidence and that there's not broader implications for the other parts of the HA portfolio to come?

133. In response, Defendant Reali stated:

So we model this out, and we have a full understanding of where our pricing is going to go over the next year with all 3 HA products, DUROLANE, GELSYN as well as SUPARTZ. So if you look at it that way, we have a really good understanding of that as well as the market dynamics.

134. The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Bioventus had materially deficient internal controls over financial reporting; (i) The Red Report specifically found that the Company's internal controls were ineffective and that the Company lacked any formal method of calculated rebate accruals or tracking rebates; (iii) as a result, the Company's revenues were overstated and Bioventus faced a substantial risk of a material revenue reversal; (iv) the shift to ASP pricing was going to drastically reduce the margins and profitability of the Company's two main products; and (v) as a result of the foregoing, the Individual Defendant's positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

**THE TRUTH GRADUALLY EMERGES AS THE INDIVIDUAL DEFENDANTS CONTINUE TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS**

135. On November 8, 2022, Bioventus filed a current report on Form 8-K, revealing disappointing financial results for the third quarter of 2022. The Company reported $137 million

in total revenue and $22.7 million in EBITDA, significantly below consensus estimates of $141.6 million and $25.3 million.  Bioventus further reported 55.419 million in net sales for its Pain Treatments vertical. The Company attributed a 13% quarter-over-quarter decline in revenues from the Pain Treatments vertical to a slump in the demand for Gelsyn.  In light of the poor results, Bioventus reduced its net sales guidance from its previous range of $547.5 million to $562.5 million to a range of $527 million to $532 million.

136.    During an earnings call held on the same day, Defendant Reali admitted that the "revenue shortfall" was "primarily . . . attributed to transitory headwinds related to GELSYN" and further attributable to "higher than normal rebate claims due to unexpected prior period rebate charges from a private payer who found errors in their earlier claims reporting" and "the recent change in pricing to average selling price, or ASP, from wholesale acquisition cost, or WAC."

137.    However, Defendant Reali concealed the full extent of the Company's issues, insisting that the new pricing "dynamic did not impact Durolane," and that Bioventus had a "full understanding" of HA product pricing.  Defendant Reali stated: "So we model this out, and we have a full understanding of where our pricing is going to go over the next year. . . . We certainly know the competition. We know the markets and we know where the pricing is going to be."

138.    On this news, the price of Bioventus's stock declined 57.5% in one day, closing at $3.00 per share on November 8, 2022.

139.    On November 16, 2022, Bioventus announced that it would be unable to timely file its quarterly report on Form 10-Q for the third quarter of 2022 and disclosed that the Company may be required to take "an impairment charge in the range of $185 million to $205 million." The Company further disclosed that Bioventus was "seeking resolution" of the validity of a "revised invoice" for "rebate claims from a large private payer in relation to our Pain Treatments vertical,"

41

and that the "recognition of additional rebates may impact Bioventus's recently announced revenue guidance." The Company admitted that its "internal controls related to the timely recognition of quarterly rebates were inadequate specifically for the period ended October 1, 2022" and stated that it was "evaluating whether [it] will be able to meet all of its financial obligations as they come due within one year."

140. On this news, the price of Bioventus's stock declined 33% in one day, closing at $1.97 on November 17, 2022.

141. On November 21, 2022, Bioventus belatedly filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2022 (the "2Q2022 Form 10-Q"), which revealed that rebate claims during the third quarter of 2022 had caused an $8.4 million reduction in revenue that had previously been reported for the third quarter of 2022 along with a $4.3 million reduction in adjusted EBITDA. This reversal contributed to a 16% year-over-year revenue decline of $8.953 million in Pain Treatments vertical revenues in the United States. The Company attributed the decline in Pain Treatments revenues to "more treatments being sold under contracts with major issuers at lower prices and price competition within the osteoarthritic joint pain treatment market."

142. The 3Q2022 Form 10-Q further revealed a $189.2 million "non-cash impairment charge required by U.S. generally accepted accounting principles [GAAP]" "due to the recent decline in our market capitalization." This disclosure thereby admitted that Bioventus's overall business was suffering significantly due to the ASP pricing shift and the Company's internal control deficiencies.

143. The 3Q2022 Form 10-Q further stated:

The Company's management, including our Chief Executive Officer and Chief Financial Officer, identified a material weakness related to the Company's internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that

42

there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected and corrected on a timely basis.

144. The 3Q2022 Form 10-Q more specifically admitted that the Company's "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third quarter 2022 rebates accrual was complete and accurate." Bioventus disclosed for the first time that, when it received the multi-million-dollar claim from United, "there were not processes in place to ensure it was reviewed timely in order to update the [third quarter rebates] accrual."

145. The 3Q2022 Form 10-Q further revealed that the $8.4 million reduction in revenue was "related to the rebates accrual adjustment for 2022 and [sic] cascading effect on future revenue projections materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" 3Q2022 Form 10-Q. The Company explained that recent "conditions and events raise substantial doubt about the Company's ability to continue as a going concern."

146. On this news, the price of Bioventus's common stock declined 3.7% in one day, closing at $1.81 per share on November 22, 2022.

147. On January 11, 2023, at the JPMorgan Healthcare Conference, an analyst asked Defendant Reali the following question:

> If we do start with the short term, there's been some disruption in the HA market. They switched how they measure pricing, and it's led to a market decline, not just with you but also across your competitors. So maybe spend a minute there exactly what's happening? How much of an impact it's have on Bioventus and when it should resolve?

43

148.   In response, Defendant Reali stated: "First of all, with DUROLANE, we have seen sustained double-digit volume growth and that has counteracted any impact on reduction of the transfer price from wholesale acquisition to average selling price."

149.   On March 31, 2023, the truth finally fully emerged when the Company issued a press release included as an attachment to a current report on Form 8-K disclosing its fourth quarter and fiscal year 2022 financial results.  The press release quoted Defendant Reali as stating: "Our results reflect additional pressure in our Pain Treatments vertical, primarily due to additional rebate claims previously not billed to us from a private payer, which offset the double-digit growth we are seeing in the Surgical Solutions vertical."

150.   The press release further reported that "[t]otal net sales were $125.8 million compared to $130.4 million for the fourth quarter of 2021, a decrease of $4.6 million, or 3.5%, year-over-year, due to a decline in the Pain Treatments vertical, primarily driven by a decline in price resulting from higher than expected rebate claims."

151.   During an earnings call held on the same day, Defendant Reali stated that the Company's financial performance "fell below our expectations" because of "continued pressure across our HA franchise" and alleged "[u]nanticipated rebate claims from one private payer," "along with lower volume growth and decreased selling price across our HA business."  Defendant Reali further revealed that the Company received "rebate claims of approximately $4 million" from United, "which represent claims previously not billed to us. United Optum recently notified us that they had found these unbilled claims in their system through their internal audit of their rebate process in the fourth quarter, which revealed that they had underbilled us."

152.   Defendant Reali further admitted that, as a result of the rebate claims, Bioventus's "average selling price, or ASP, for both Durolane and Gelsyn is now lower than previously

expected," that the Company had "double-digit price loss" on Durolane, and that "Durolane revenue declined high single digits for the quarter." Defendant Reali also revealed that, because the Company was struggling financially, Bioventus could no longer afford to make the payments necessary to complete the CartiHeal acquisition dating back to July 2022 and would therefore have to pay $10 million to CartiHeal's former owners to cancel the acquisition.

153. Also, on March 31, 2023, Bioventus filed its 2022 annual report on Form 10-K (the "2022 Form 10-K"), revealing a 3.1% decline in U.S. Pain Treatments net sales from $201.068 million in 2021 to $194.830 million in 2022. The Company attributed the decline to "more treatments being sold under contracts with major insurers resulting from higher than expected rebate claims and price competition within osteoarthritic joint pain treatment market, partially offset with an increase in sales volume." The 2022 Form 10-K further stated that "due to the manner in which rebates are calculated and paid under certain of our contracts with private payers, changes in the ASP for our HA visco supplements may result in larger than expected rebates payments for the sale of these products."

154. On this news, the price of Bioventus's stock declined 11.6%, closing at $1.07 per share on March 31, 2023.

155. On April 5, 2023, Bioventus announced that the Board had informed Defendant Reali on April 3, 2023 "that he would transition from his role as" as CEO of the Company. Defendant Reali avoided his firing by resigning as an officer and director the next day, April 4, 2023.

156. Following the departure of Defendant Reali, Anthony P. Bihl III, the Company's former CEO from 2013 until 2020, joined the Company as interim CEO. Since then, the Company

has already sold off several of the businesses that it had acquired under Defendant Reali's leadership in order to raise needed cash and keep the Company afloat.

## DAMAGE TO THE COMPANY

**Securities Class Action**

157. On January 12, 2023, a securities class action complaint was filed in the United States District Court for the Middle District of North Carolina against the Company the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Ciarciello v. Bioventus, Inc., et al.*, Case No. 1:23-cv-00032 (M.D.N.C.) (the "Securities Class Action").

158. As the Court in the "Securities Class Action found , "plaintiffs set forth extensive facts to support the following: ***(1) Bioventus never designed or implemented a documented or consistent process for estimating rebates and changed the estimated inputs for rebate calculation without any data or legitimate reason; (2) the defendants knew that their rebate calculation methods were inadequate because of the large rebate request in 2021 and the audit report***; (3) the defendants did not take serious steps to create a process for estimating rebates that went beyond guessing; and (4) the defendants continued to assert that they had adjusted net revenue projections based on a careful evaluation of data, including 'historical experiences' and 'known market events and trends' when they had not." ECF No. 75 at 5 (emphasis added).

159. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers through substantive litigation which has ultimately settled for $15.25 million.

**Unjust Compensation**

160.    At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

**UNJUST COMPENSATION[4]**

| Individual | 2021 ($) | 2022 ($) | 2023 ($) | TOTAL ($) |
|---|---|---|---|---|
| Reali | 12,618,883 | 4,395,233 | 1,319,972 | 18,334,088 |
| Singleton | - | 2,462,453 | 1,058,233 | 3,520,686 |
| Anglum | 3,718,800 | - | - | 3,718,800 |
| Stalnecker | 552,487 | 231,996 | 165,728 | 950,211 |
| Hawkins | 905,580 | 316,991 | 199,478 | 1,422,049 |
| Beyer | 55,019 | 216,996 | 150,728 | 422,743 |
| Ladone | 121,488 | 224,496 | 158,228 | 504,212 |
| McMurry-Heath | - | 228,361 | 156,978 | 385,339 |
| Neels | 213,503 | 214,496 | 148,228 | 576,227 |
| Nohra | 224,579 | 226,996 | 153,228 | 604,803 |
| Parker | 214,006 | - | - | 214,006 |
| Sutter | 215,718 | 216,996 | 150,728 | 583,442 |
| Vizirgianakis | 52,832 | 188,762 | - | 241,594 |
| **TOTAL** | **18,892,895** | **8,923,776** | **3,661,529** | **31,478,200** |

**Additional Damage to the Company**

161.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

162.    The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

---

[4]    Including salary, fees earned or paid in cash, stock awards, option awards, and payments to secure the execution of employee lock-up agreements, paid to the officers and directors between during the Relevant Period, rounded to the nearest whole dollar and prorated as appropriate, insofar as can be ascertained.

163.    The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

164.    At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

165.    Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

166.    As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

167.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

168.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director

Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

169.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

170.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about

49

the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

171.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

172.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the

50

Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DEMAND REFUSED ALLEGATIONS

173.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Individual Defendants' violations of the law, and their breaches of fiduciary duties, waste of corporate assets, and other wrongful conduct as alleged herein.

174.    Plaintiff is a current stockholder of Bioventus and has owned Bioventus stock at all relevant times hereto.  Plaintiff understands his obligation to hold Bioventus stock throughout the pendency of this action and is prepared to do so.

175.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

176.    Following the alleged misconduct and damage, on February 6, 2025, Plaintiff made a demand (the "Demand") on the Board of Directors (the "Board") to commence a civil action against each responsible entity and affiliate of the Company – naming each of the Individual Defendants  – to recover, for the benefit of the Company, the damage caused to it.  Attached hereto as Exhibit A, respectively, is a true and correct copy of the Demand.

177.    To date, the Boad has not responded.  The Board's lack of response could subject the Company's claims to the applicable statute of limitations period, leaving the Company without remedy.  Accordingly, these actions cannot be reasonably interpreted as being in the best interests of the Company.

178.    As such, the Board's response here is an unreasonable and wrongful refusal of

51

Plaintiff's Demand to initiate a civil action for the benefit of the Company. The Company has suffered damage and will continue to suffer damage if the wrongs complained of herein remain uncorrected. Thus, Plaintiff has satisfied the demand requirements and may pursue this action to procure a judgment in Bioventus' favor.

## CLAIMS FOR RELIEF

## COUNT ONE

## (Against the Individual Defendants for Violations of § 14(a) of the Exchange Act)

179.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

181.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Under the direction and watch of the Individual Defendants, the 2022 Proxy Statement failed to disclose that: (i) Bioventus had materially deficient internal controls over financial reporting; (i) the Red Report specifically found that the Company's

52

internal controls were ineffective and that the Company lacked any formal method of calculated rebate accruals or tracking rebates; (iii) as a result, the Company's revenues were overstated and Bioventus faced a substantial risk of a material revenue reversal; (iv) the shift to ASP pricing was going to drastically reduce the margins and profitability of the Company's two main products; and (v) as a result of the foregoing, the Individual Defendant's positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

182.    Moreover, the 2022 Proxy Statement failed to disclose that the Board's oversight and risk mechanisms were not adequate given the aforementioned misconduct and that the Code of Ethics was not complied with.

183.    The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff and Company shareholders in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of directors.

184.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

## COUNT TWO

### (Against Defendants Reali, Singleton, Anglum and Stalnecker for Contribution Under § 21D of the Exchange Act)

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.    The conduct of Defendants Reali, Singleton, Anglum, and Stalnecker as described herein has exposed the Company to significant liability under various federal securities laws by

their misconduct.

187.     Bioventus and Defendants Reali, Singleton, Anglum and Stalnecker are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 11(f) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

188.     On January 12, 2023, a securities class action complaint was filed in the United States District Court for the Middle District of North Carolina against the Company and certain officers. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Ciarciello v. Bioventus Inc., et al.*, 1:23cv32 (M.D. N.C.) ("Securities Class Action").

189.     The Securities Class Action settled in the amount of $15,250,000 to resolve the claims.  This settlement has been approved by the Court.  As a result of the wrongs complained of herein, the Officers and Directors have subjected the Company to the significant cost of defending itself and certain of the Company's officers.

190.     Defendants Reali, Singleton, Anglum and Stalnecker, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Bioventus, including the wrongful acts complained of herein and in the Securities Class Action.

191.     Accordingly, Defendants Reali, Singleton, Anglum and Stalnecker are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

192.    As such, Bioventus is entitled to receive all appropriate contribution or indemnification from Defendants Reali, Singleton, Anglum and Stalnecker.

**COUNT THREE**

**(Against The Individual Defendants for Breach of Fiduciary Duties)**

193.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

194.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

195.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry and good faith.

196.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

197.    In breach of their fiduciary duties owed to Bioventus, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Bioventus did not have effective internal controls over financial reporting; (2) due to these widespread issues, the Company could not effectively monitor or calculate the amount of rebates nor the rebate amount that had to be deducted from revenue; (3) the Company was not complying with GAAP requirements and incorrectly reported $12.4 million in revenue; (4) as a result, the Company faced a significant risk of material

revenue reversals due to material overstatements of revenue and Adjusted EBITDA; and (5) the Company would be detrimentally affected by new Medicare regulations that lowered prices and reimbursement on HA products. As a result of the foregoing, Bioventus's public statements were materially false and misleading at all relevant times.

198.   Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Bioventus had materially deficient internal controls over financial reporting; (ii) The Red Report specifically found that the Company's internal controls were ineffective and that the Company lacked any formal procedure for tracking rebates and verifying rebate claims; (iii) as a result, the Company's revenues were materially overstated; (iv) Congress had enacted a new law that was going to drastically reduce the margins and profitability of the Company's two main products; and (v) as a result of the foregoing, the Individual Defendant's positive statements regarding the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

199.   As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT FOUR

### (Against the Individual Defendants for Aiding and Abetting)

200.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

201.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

202.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

203.    The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

204.    As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

205.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

206.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT FIVE

### (Against The Director Defendants for Gross Mismanagement)

57

207.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

208.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

209.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

210.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT SIX

### (Against the Individual Defendants for Waste of Corporate Assets)

211.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

212.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

213.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions.

214.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## COUNT SEVEN

### (Against The Individual Defendants For Unjust Enrichment)

215.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

217.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

218.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.      Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' unjust enrichment;

D.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 6, 2025

*/s/ Paul R. Dickinson, Jr.*
**LAW OFFICES OF JAMES SCOTT FARRIN**
Paul R. Dickinson, Jr.
NC Bar No.: 20510
555 S. Mangum St.; Ste. 800
Durham, NC 27701
T: 919-688-4991
F: 919-688-4468
E: pdickinson@farrin.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna (*pro hac* admission pending)
Gregory M. Egleston (*pro hac* admission pending)
260 Madison Ave., 22nd Floor

New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***